**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00068 (TNM)** |
| **v.** | : | |
| | : | |
| **ELIEL ROSA,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Eliel Rosa to one month of home confinement, a probationary term of three years, 60 hours of community service, and $500 in restitution.

**I.      Introduction**

The defendant, Eliel Rosa, and his codefendant, Jenny Cudd,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

The government's recommendation of one month of home confinement is based on a careful evaluation of the defendant's participation in the January 6 attack on the United States Capitol, his individual conduct on that day, and his statements before and after January 6. Unlike the vast majority of other defendants, Mr. Rosa voluntarily contacted the FBI on January 9, just

---

[1] Co-defendant Jenny Cudd is charged in the same case, *United States v. Cudd*, 21-cr-68, and trial is scheduled for February 7, 2022.

1

three days after the attack on the Capitol, to admit that he was one of the individuals who entered the Capitol. However, there is no question that on January 6 Mr. Rosa watched the chaos unfolding in front of him outside the Capitol, yet he marched forward. He marched on the Capitol along with scores of others, he entered the United States Capitol where he knew the Congressional certification was underway, and he remained inside undeterred for at least 20 minutes.

Even though he stands before this Court to be sentenced on a misdemeanor conviction, the Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification renders the recommended sentence of home confinement both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 60 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Eliel Rosa's Role in the January 6, 2021 Attack on the Capitol*

Eliel Rosa and Jenny Cudd[2] traveled to Washington, D.C., from their homes in Texas to attend the "Stop the Steal" rally on January 6, 2021. *See* ECF 60 at ¶ 8. Mr. Rosa knew that on January 6, 2021, at the United States Capitol, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election. *Id.*

Mr. Rosa also demonstrated that he understood the Certification would take place at the Capitol on January 6 and that he supported the "fight" to stop "[President] Biden [from being] given the win," through his posts on Facebook. For example, on January 2, 2021, Mr. Rosa posted the following explaining why he decided to participate.

**Image 1**



---

[2] In an interview with the FBI, Mr. Rosa explained his relationship to his co-defendant Jenny Cudd. Mr. Rosa and Ms. Cudd are new friends, who met at an event in November 2020. Mr. Rosa explained that he and his co-defendant Jenny Cudd held similar beliefs. Although the two were not travel companions, they both discussed their plans to travel to Washington, D.C. and stayed in the same hotel in separate rooms.

On the morning of January 6, 2021, Mr. Rosa posted the below photo and caption, "And we fight!!!"

**Image 2**



In an interview with the FBI, Mr. Rosa admitted to his conduct on January 6. In the afternoon on January 6, 2021, after listening to President Trump's speech, Mr. Rosa returned to his hotel, however, he decided he would follow others heading toward the Capitol after learning that Vice President Pence was not going to take action. Mr. Rosa met with his friend Ms. Cudd at the hotel and together they marched toward the United States Capitol where he knew the Congressional certification was taking place. He approached from the West. ECF 60 at ¶ 10. As he approached the United States Capitol, he observed a large group of individuals shouting. *Id.* at ¶ 11. He heard people with megaphones shouting, "Go, Go, Go." *Id.*

Mr. Rosa marched with the crowd that descended on the United States Capitol, and he heard bangs and acknowledged the smell and presence of pepper spray that had been deployed. *Id.* at ¶ 11. Based on these admitted observations, it is clear that he knew the rioters' conduct was escalating, and he knew the rioters were clashing against law enforcement officers who were protecting the Capitol – yet he continued to march toward the Capitol.

Mr. Rosa was inside the Capitol for 20 minutes, from 2:35 p.m. to 2:54 p.m. At approximately 2:35 p.m., Mr. Rosa and Ms. Cudd walked into the United States Capitol through the Upper West Terrace Door. Below is a screenshot from United States Capitol Police CCTV of Mr. Rosa's entry. Mr. Rosa is circled in red.

**Image 3**



At 2:36 p.m., Mr. Rosa entered and remained inside the Rotunda until approximately 2:39 p.m., where USCP CCTV captured him taking photos.

**Image 4**



Mr. Rosa also posted the following third party image on Facebook proudly documenting his time in the Rotunda.

**Image 5**



From 2:39 p.m. to 2:42 p.m., Mr. Rosa moved through Statuary Hall and the Statuary Hall Connector. At approximately 2:43 p.m., Mr. Rosa along with Ms. Cudd departed from a large crowd in front of the main door of the House Chamber and walked east. They passed the Upper House Door and walked toward the other entrance to the House Chamber.

At approximately 2:54 p.m., Mr. Rosa is observed at the Upper House Door before he exited the Capitol. In the below screenshot from USCP CCTV, law enforcement appears to be escorting the crowd to the exit.

**Image 6**



In total, Mr. Rosa spent 20 minutes inside of the Capitol. He knew the Certification was underway inside the Capitol, and he admitted that he knew at the time he entered the U.S. Capitol that he did not have permission to do so and that he unlawfully paraded, demonstrated, and/or picketed. *See* ECF 60 at ¶ 19.

*Eliel Rosa's Interview*

Following the events of January 6, 2021, Mr. Rosa decided to turn himself in. On January 9, 2021, he voluntarily went to the local FBI office to admit that he entered the United States Capitol and he agreed to a voluntary interview with the FBI. At the time, no arrest warrant had been obtained for Mr. Rosa. During the voluntary interview, Mr. Rosa described in detail his participation in the events of January 6 and expressed remorse for his conduct.

*The Charges and Plea Agreement*

As stated above, on January 9, 2021, Eliel Rosa voluntarily went to the FBI to admit to his unlawful conduct. On January 12, 2021, Mr. Rosa and Ms. Cudd were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1)-(2), and 40 U.S.C. § 5104(e)(2). On February 3, 2021, both defendants were charged by a five-count Indictment with 18 U.S.C. §§ 1512(c)(2) and (2); 18 U.S.C. §§ 1752(a)(1)-(2); and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 29, 2021, Mr. Rosa pleaded guilty to Count Five of the Indictment, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Mr. Rosa agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). We therefore turn to these factors.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the

Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In this case, Mr. Rosa admitted that he knew the Certification was taking place at the Capitol on January 6. He also expressed his feelings on Facebook before January 6. On January 2, he posted a quote to describe why he was participating, in his words, in the "fight."  His post is captured in above Image 1. Again, while in D.C. on the morning of January 6, he posted a photo as he walked to the rally stating, "And we fight!!!" as captured in Image 2 above. Further, when he later marched toward the Capitol, and as he got closer to the Capitol Building, he admitted that he heard yelling and chanting, heard bangs, and acknowledged the presence of pepper spray. Based on these observations, he knew that the crowd of individuals in front of him was clashing against law enforcement in front of him, yet he marched forward.  Mr. Rosa entered the Capitol, with a larger crowd, through a set of double doors.  Certainly, this conduct alone was wrong given the context that day.

While no police officers blocked his path to entry, there were clear signs of violent entry. As they moved through the Capitol, he would have seen broken glass. He would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. He was aware that tear gas had been deployed. He

did not stop at the Rotunda, but instead moved deeper into the U.S. Capitol. He remained in the Capitol for 20 minutes, and when he finally decided to leave law enforcement can be seen escorting the crowd toward the exit (see Image 6).

On the other hand, the entirety of Mr. Rosa's entry in the Capitol is captured on CCTV, there is no evidence that the defendant engaged in any violence or destruction of property, and there is no evidence that he destroyed evidence after the riot.  Most notably, unlike the vast majority of defendants, he voluntarily contacted the FBI three days later to admit that he was one of the individuals who entered the Capitol, voluntarily interviewed with the FBI, and told them about his actions that day in detail. In the interview, he also expressed remorse for his actions. He stated that he blamed himself for his conduct, that he was ashamed of himself, and that it was the most stupid thing he has done. He stated that he broke the law. He said that he would not hide - Mr. Rosa demonstrated that he was prepared to face the consequences of his actions.

While the nature and circumstances of the offense support a sentence of incarceration, the government also considers Mr. Rosa's lack of participation in any assaultive or destructive conduct, early acceptance of responsibility, compliance with law enforcement, and expressions of remorse. For misdemeanor defendants who, like Eliel Rosa, engaged in conduct that was less egregious considering the nonexclusive factors listed above, the government is more likely to recommend a more lenient sentence. However, a full probationary sentence is not appropriate in this case because, on January 6, Mr. Rosa watched the chaos unfold in front of him outside the Capitol, yet he marched on.  He marched on the Capitol along with scores of others, he entered the United States Capitol where he knew the Congressional certification was underway, and he remained inside undeterred for at least 20 minutes.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Eliel Rosa does not have any prior convictions. If the Sentencing Guidelines did apply to his conviction, he would have zero points and would be in Criminal History Category I. This factor supports a more lenient sentence.

In addition, the defendant provided information regarding his personal and family background in his interview with the Presentence Investigation Report writer. *See* ECF 64 (Draft, Presentence Investigation Report) at 11-17. The defense also provided the government with numerous character references and a letter from Mr. Rosa.[3] Mr. Rosa's letter to the government described his remorse for his actions on January 6, 2021. Mr. Rosa wrote:

> I [Eliel Rosa] want to state, once again, that I am aware of my guilty of trespassing the Capitol facility on January 6, a day of infamy to me for the rest of my brief life on this earth. Yes, I learned the lesson of reaping the fruits of my stupidity in the most painful way. . . . I promise you that I have learned the lesson. . . . I only have good intentions toward this nation in my heart and future plans.[]
>
> . . . I am not asking you to give me mercy. I do deserve my punishment. . . . I never wanted to hurt this nation.
>
> . . . After three months I had, this past week, the courage to watch the videos of that day. The voices of desperation coming from the Capitol Police officers will forever be engraved in my memory. I look forward to the day when I will be able to go to DC again and personally ask for their forgiveness for sadly being apportioned with those who brought so much chaos and pain to them, emotionally and physically.

The government notes that Mr. Rosa voluntarily interviewed with the FBI on January 9 – three days after the Capitol Breach on January 6 – and readily acknowledged his conduct and remorse. While on pretrial release, he complied with his conditions of release, and he expressed

---

[3] Although the defense provided these materials to the government during the course of plea negotiations, the defense agreed that the government could refer to these materials in its sentencing memorandum. Due to the extent of the personal information contained within these materials, the government does not intend to attach these materials to its public filing. The government anticipates the defense will submit these materials in connection with the defense sentencing memorandum.

an interest in pleading guilty early and accepted a plea offer from the government once given the opportunity. When recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demand deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

On the one hand, Mr. Rosa's actions on January 6, highlight the need for deterrence. He knew the Certification was underway at the Capitol. He acknowledged that through his

observations he knew that the crowd in front of him was clashing against law enforcement protecting the Capitol, yet he continued to march toward the Capitol.  And when he entered the Capitol, he proceeded to take out his phone to document what he and his fellow rioters had accomplished.  This course of conduct shows a troubling lack of understanding, at least at the time, regarding the extreme seriousness of the situation.

However, as discussed above, Mr. Rosa's actions at the Capitol that day were much more limited than most individuals, and within three days, on January 9, he decided to voluntarily go to the FBI to admit to his conduct. He interviewed with the FBI readily acknowledging his unlawful behavior and his remorse. On January 9, in the interview with the FBI, he stated that he felt it was the most stupid thing he has done, he acknowledged that he messed up big time, and he would take responsibility and not hide. He has shown that he takes this incident seriously through his ready compliance with the FBI and through his subsequent letter to the government.

In short, the question of deterrence, here, is multi-faceted.  The demands of general deterrence favor incarceration, but the need for specific deterrence may be met with a less severe sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the

Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the latter category for the reasons articulated above.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Eliel Rosa to one month of home confinement, three years of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a

consequence of his behavior, while recognizing his early acceptance of responsibility. Additionally, such a sentence recognizes that some, but not all of the factors enumerated in Section IV.A., above, apply to his case. It also allows continued monitoring of Mr. Rosa in the event of future participation in similar conduct.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


By:     */s/ Amanda Fretto*
        AMANDA FRETTO
        DC Bar No. 1018284
        Assistant United States Attorney
        Federal Major Crimes Section
        U.S. Attorney's Office
        555 4th Street, N.W., Room 4125
        Washington, DC 20530
        Office: 202-252-7268
        Amanda.Lingwood@usdoj.gov